SHINHOLSTER v ANNAPOLIS HOSPITAL

Docket Nos. 225710, 225736. Submitted July 10, 2002, at Detroit. Decided
February 14, 2003, at 9:05 A.M. Leave to appeal sought.

Johnnie E. Shinholster, as personal representative of the estate of
Betty J. Shinholster, brought an action in the Wayne Circuit Court
against Annapolis Hospital; Dennis Adams, M.D.; and Mary E.
Flaherty, M.D., alleging medical malpractice by the defendants
related to treatment they provided to the decedent. The decedent
had high blood pressure but had not regularly taken her hyperten-
sion medication. She made several visits to the defendant hospital,
where she was seen by the defendant doctors before she suffered a
massive stroke, lapsed into a coma that lasted for several months,
and died. The court, John A. Murphy, J., entered judgment on a jury
verdict and award of damages for the plaintiff. The defendants
appealed, and their appeals were consolidated. While the appeals
were pending, Dr. Adams died and Katherine Adams, personal rep-
resentative of his estate, was substituted in his place.

The Court of Appeals held:

1. The trial court did not err in limiting the jury's consideration
of the plaintiff's decedent's comparative negligence (i.e., the dece-
dent's failure to follow doctors' orders or take prescribed medica-
tion) to the period following her first visit to the defendant hospi-
tal. In a medical malpractice case, the defendant may not argue
that the plaintiff was comparatively negligent by creating the condi-
tion that caused the plaintiff to seek treatment. Given the preventa-
ble nature of many illnesses, to accept the contrary position would
allow many health-care professionals to escape liability for negli-
gently treating ill patients.

2. The trial court did not abuse its discretion in ruling that an
emergency medicine physician offered by the plaintiff was qualified
to give expert testimony on the decedent's life expectancy. The
physician had knowledge, skill, experience, training, or education
relevant to issues of a person's general health and life expectancy.
MRE 702.

3. The trial court erred in instructing the jury that the jury could
consider a statutory mortality table inasmuch as the mortality table
has been repealed. The error, however, does not require reversal

because it did not affect the outcome of the case because the trial court specifically noted that the mortality figures were to be considered in determining life expectancy only if the jury found that the decedent was in ordinary good health. The testimony at trial was abundantly clear that the decedent was not in ordinary good health.

4. The trial court did not err in applying the $500,000 cap on noneconomic damages under MCL 600.1483 rather than the lower cap of $280,000. Under the statute, the higher cap applies whenever one of the enumerated conditions is present. The point of reference for determining whether the injured person fits within an enumerated condition is any time after and as a result of the negligent action. Here, the higher cap applies because the decedent was rendered incapacitated by the defendants' negligence. The fact that the decedent was no longer incapacitated because she was already dead does not mean that she could not fit within the enumerated condition that applies to incapacity. There is no merit to the defendant hospital's contention that only damages associated with the coma should be subject to the higher cap. Under the plain language of the statute, if a plaintiff falls within an enumerated condition, the total noneconomic damages associated with the malpractice, including damages resulting from an accompanying death, are subject to the higher cap.

5. The trial court did not err in refusing to reduce the jury's award of future damages to present value under MCL 600.6306. While MCL 600.6306(1)(c), (d), and (e) mandate that awards of future damages be reduced to present value, MCL 600.6311 states that the mandate does not apply to a plaintiff who is sixty years of age or older at the time of judgment. Here, regardless of whether "plaintiff" refers to the plaintiff or his decedent, at the time of judgment the plaintiff was over sixty and the decedent would have been over sixty.

6. The trial court did not err in denying the defendants' request for a reduction of past economic damages for payment by Medicaid of much of the decedent's medical expenses. MCL 600.6303(1) directs that economic damages be reduced by amounts received from a collateral source. MCL 600.6303(4) does not include Medicaid benefits among those it defines as collateral sources.

7. The trial court did not err in applying the statutory damages cap after it adjusted the verdict for the decedent's comparative negligence. The procedure employed by the trial court conforms with MCL 600.6304(3).

Affirmed and remanded for entry of a judgment in a sum certain.

1. NEGLIGENCE — MEDICAL MALPRACTICE — COMPARATIVE NEGLIGENCE.

   A medical malpractice plaintiff's actions leading to the condition or injury for which the plaintiff sought medical treatment may not be considered when determining whether the plaintiff was comparatively negligent.

2. NEGLIGENCE — MEDICAL MALPRACTICE — NONECONOMIC DAMAGES — STATUTORY CAP.

   Whether a person injured by medical malpractice satisfies one of the statutorily enumerated conditions for which a higher cap for noneconomic damages is set is determined at any time after and as a result of the negligent action (MCL 600.1483[1][a]-[c]).

3. DAMAGES — PERSONAL INJURY ACTIONS — ECONOMIC DAMAGES — COLLATERAL SOURCES — MEDICAID BENEFITS.

   A personal injury plaintiff's receipt of Medicaid benefits does not require an offset against the plaintiff's judgment for economic damages under the collateral source rule; Medicaid benefits are not included in the statutory definition of "collateral source" (MCL 600.6303[1], 600.6303[4]).

*Granzotto & Nicita, P.C.* (by *Mark Granzotto*), and *The Thurswell Firm* (by *Judith A. Susskind*) for Johnnie E. Shinholster.

*Dolenga & Dolenga* (by *Michael D. Dolenga*) for Annapolis Hospital.

*Fraser Trebilcock Davis & Dunlap, P.C.* (by *Graham K. Crabtree*), for Katherine Adams, personal representative of the estate of Dennis Adams, M.D., deceased, and Mary Ellen Flaherty, M.D.

Before: MURPHY, P.J., and GRIFFIN and METER, JJ.

METER, J. In these consolidated appeals arising from a medical malpractice case, defendants appeal as of right from a judgment for plaintiff entered after a jury trial. We affirm and remand for entry of a judgment in a sum certain consistent with this opinion.

Plaintiff's decedent, Betty Jean Shinholster, made four visits to defendant hospital in April 1995, com-

plaining of dizziness, among other things. She was seen by Dr. Dennis Adams[1] on April 7 and April 10 and by Dr. Mary Ellen Flaherty on April 14. Her fourth visit, on April 16, was precipitated by a massive stroke; she lapsed into a coma lasting for several months and subsequently died. She was sixty-one years old at the time of her death. Plaintiff, Shinholster's husband, alleged that Adams and Flaherty treated Shinholster negligently on April 10 and 14[2] and failed to recognize that Shinholster had been experiencing transient ischemic attacks, or "mini-strokes" that often precede a full-blown, serious stroke.

The jury found for plaintiff and awarded the following in damages: (1) $220,000 for past economic damages, (2) $564,600 for past noneconomic damages, (3) $9,700 each year in future economic damages for the years 1999 through 2003, and (4) $62,500 each year in future noneconomic damages for the years 1999 through 2003. The jury further concluded that Shinholster had been twenty percent comparatively negligent in her actions after April 7, 1995.

I

On appeal, defendants first argue that the trial court erred in allowing the jury to consider Shinholster's potential comparative negligence only for the period following her April 7, 1995, hospital visit. Defendants point to the evidence that Shinholster had

[1] Dennis Adams evidently died during the pendency of the instant appeals, and his spouse Katherine was appointed as the personal representative of his estate and substituted as a party in Docket No. 225736.

[2] Plaintiff did not allege negligence with respect to Shinholster's treatment on April 7.

not been regularly taking her blood pressure medication for at least a year before April 7, 1995, and argue that this contributed to her fatal stroke. Defendants argue that because Michigan requires that liability be apportioned directly in accordance with each party's fault, the jury should have been allowed to consider whether Shinholster's failure to take regularly her blood pressure medication in the year before her death proximately caused, at least in part, her fatal stroke.

In allowing defendants to present evidence of Shinholster's noncompliance with her doctor's orders, the trial court limited the use of the testimony as follows:

> [T]hey are only going to consider it in the context of whether or not she would be in compliance with the instruction of the doctors when she received the prescription of April 7th.
>
> So it comes in for right now. The jury can consider it in terms of whether or not the deceased was consistent in not taking her medicine before and not taking her medicine after she was prescribed it by Dr. Adams and told to follow-up [sic] with her treating physician.
>
> *     *     *
>
> This is a tough issue, and I'm going to make the call as I initially indicated.
>
> The witness will be allowed to give his opinion as to whether or not the non-compliance after April 7th formed the basis of comparative negligence.

The court instructed the jury as follows:

> Members of the jury, the total amount of damages that the Plaintiff would ever be entitled to recover will be reduced by the percentage of Plaintiff's [sic] negligence

after April 7th, 1995, that contributed as a proximate cause to her injury.

\*     \*     \*

Members of the jury, there was evidence in this case regarding the medical habits of the deceased as to whether she followed Dr. Vicenzio's orders and took her medications properly prior to her treatment with Defendant doctors. This evidence may not be the basis for any findings that the deceased was comparatively negligent before April 7, 1995[,] the date she sought treatment from the Defendants.

You may consider this as evidence only in determining whether she filed [sic] the orders of Defendants Adams and Flaherty and other staff members of the hospital.

Whether a patient's negligence in contributing to the condition that led her to seek medical help in the first instance may be considered by the jury in a medical malpractice lawsuit involves a question of law. We review questions of law de novo. *Detroit Free Press, Inc, v City of Warren*, 250 Mich App 164, 166; 645 NW2d 71 (2002). Upon review de novo, we find that the trial court properly limited the jury's consideration of comparative negligence to the period after Shinholster's treatment on April 7, 1995.

Plaintiff primarily relies on *Podvin v Eickhorst*, 373 Mich 175; 128 NW2d 523 (1964), in support of his position. In *Podvin, supra* at 177-178, the plaintiff was injured in an automobile accident and later alleged that the defendants treated his injuries negligently. In opening and closing arguments, defendants suggested that the plaintiff himself was negligent by causing the automobile accident. *Id.* at 181. Then,

[a]pparently in an effort to counter the effect of such comment, plaintiff's counsel requested the trial judge to instruct the jury that it should not consider whether or not plaintiff

> was at fault in causing the automobile accident, that plaintiff's negligence was not an issue in this case for its consideration and that the only question it should consider was whether or not plaintiff had been given proper medical care according to the standard of practice in the community of Flint. [*Id.*]

The trial court did not give the requested instruction but instead stated that the jury could "consider the evidence relating to the accident as bearing upon the nature and extent of plaintiff's injuries but that such evidence 'would in no degree modify or lessen the treatment and care he was entitled to receive at the hands of the defendants.' " *Id.* at 181-182.

The Supreme Court ruled:

> Whatever the quoted portion of the instruction means, it was less than that to which plaintiff was entitled. The issue of contributory negligence was not involved in the case. Plaintiff requested, properly and timely, that the jury be so instructed. The trial court should have granted plaintiff's request. [*Id.* at 182.]

*Podvin* provides support for the proposition that a plaintiff's negligence in incurring an injury in the first place should not be considered in determining whether she was damaged by the negligence of the physician treating the injury. Defendants contend, however, that the relevant language from *Podvin* is essentially obiter dictum because the Court merely noted that "contributory negligence was not involved in the case," *id.*, and provided no other rationale for its ruling. Defendants point out the possibility that contributory negligence was simply not pleaded as an affirmative defense in *Podvin*. Defendants further contend that *Podvin* is unpersuasive because it was decided before the adoption of the *comparative* negli-

gence doctrine (as opposed to the *contributory* negligence doctrine) in this state and before recent tort-reform legislation mandating that fault be apportioned directly according to fault.

We agree that the *Podvin* Court failed to make clear the rationale for its ruling and that this failure limits *Podvin*'s value as precedent in resolving the instant issue. It is also possible that the *Podvin* Court would have reached a different conclusion if the comparative negligence doctrine had been in effect at the time of the decision. Accordingly, we agree that *Podvin* does not constitute binding authority for purposes of the instant case.[3]

Accordingly, the instant case essentially presents an issue of first impression in Michigan. There is some appeal to defendants' claims that under the 1995 tort-reform legislation, any fault on the part of a plaintiff (or, in this case, a decedent) should be apportioned. Indeed, MCL 600.6304(1)(b) indicates that a jury shall make findings with respect to "[t]he percentage of the total fault of all persons that contributed to the death or injury, including each plaintiff . . . ." Clearly, a person who does not follow her doctor's orders and who therefore maintains a high blood pressure is contributing to her own death.

However, most jurisdictions that have considered the issue have followed the rule that in a medical malpractice case, the defendant may not argue that the plaintiff was comparatively negligent by creating

---

[3] Nor does the related case of *Sawka v Prokopopwycz*, 104 Mich App 829; 306 NW2d 354 (1981), which relied heavily on *Podvin*, constitute binding authority for purposes of the instant case.

the condition that caused him to seek treatment.[4] See, e.g., *Rowe v Sisters of the Pallottine Missionary Society*, 211 W Va 16, ___; 560 SE2d 491, 497 (2001), *Harding v Deiss*, 300 Mont 312, 318; 3 P3d 1286 (2000), *Harvey v Mid-Coast Hosp*, 36 F Supp 2d 32, 35-38 (D Maine, 1999), and *Martin v Reed*, 200 Ga App 775, 776; 409 SE2d 874 (1991). As noted in *Martin, supra* at 777, "[t]hose patients who may have negligently injured themselves are nevertheless entitled to subsequent non-negligent medical treatment and to an undiminished recovery if such subsequent non-negligent treatment is not afforded." A persuasive rationale for this doctrine exists in *Harvey, supra* at 38:

> It would be anomalous to posit, on the one hand, that a health care provider is required to meet a uniform standard of care in its delivery of medical services to all patients, but permit, on the other hand, the conclusion that, where a breach of that duty is established, no liability may exist if the patient's own preinjury conduct caused the illness or injury which necessitated the care.

Similarly, the reporters' note on Restatement Torts, 3d, Apportionment of Liability, § 7, comment m, p 83 states

> the best explanation of pre-presentment negligence is that the consequences of the plaintiff's negligence—the medical condition requiring medical treatment—caused the very condition the defendant doctor undertook to treat so it would be unfair to allow the doctor to complain about that negligence.

---

[4] An exception is Tennessee, in *Gray v Ford Motor Co*, 914 SW2d 464 (Tenn, 1996).

We agree with the opinions expressed in the above cases and in the Restatement comment. Moreover, even though *Podvin* does not constitute *binding* authority as applied to the instant case, it nonetheless provides some support for holding that a plaintiff's actions leading to an injury for which she seeks treatment should not be considered in a comparative negligence analysis. Indeed, *Podvin* at least implies that the plaintiff's negligence should in general not be considered.

Accordingly, in light of (1) the implications of *Podvin*, (2) the holdings of the majority of jurisdictions, and (3) the rationale expressed in other jurisdictions and in the Restatement,[5] we conclude that the trial court did not err in ruling that the jury could not consider Shinholster's potential negligence in causing the condition for which she sought medical treatment in the first place.[6] Given the preventable nature of many illnesses, to accept the contrary position would allow many health-care professionals to escape liability for negligently treating ill patients.

---

[5] Moreover, it could be argued that a plaintiff's negligence in causing the injury for which she seeks medical treatment cannot be considered a proximate cause of a subsequent medical malpractice injury. As noted in *Singerman v Muni Service Bureau, Inc*, 455 Mich 135, 145 (WEAVER, J.), 146 (MALLETT, C.J.); 565 NW2d 383 (1997), quoting 57A Am Jur 2d, Negligence, § 473, p 454, " 'An event may be one without which a particular injury would not have occurred, but if it merely provided the condition or occasion affording the opportunity for the other event to produce the injury, it is not the proximate cause thereof.' " It could be argued that pretreatment negligence "merely provide[s] the condition . . . affording the opportunity for the [medical malpractice] to produce the injury." *Id.*

[6] There is ample support for the notion that a plaintiff's failure to follow a physician's orders *after* seeking treatment may be considered in a comparative negligence analysis in a lawsuit against that physician. See, e.g., *Jalaba v Borovoy*, 206 Mich App 17, 23; 520 NW2d 349 (1994).

II

Next, defendants argue that the trial court erred in allowing plaintiff's expert witness, Dr. Albert Frankel, to express an opinion regarding Shinholster's life expectancy because he was not qualified as an expert with regard to life expectancy. Defendants contend that because Frankel is an emergency medicine physician, not an internist or family practitioner, there was no showing that he had the expertise to address life-expectancy issues. We disagree.

As noted in *Joerger v Gordon Food Service, Inc*, 224 Mich App 167, 175; 568 NW2d 365 (1997), "[t]he qualification of a witness as an expert and the admissibility of the expert's testimony are within the trial court's discretion."

MRE 702 states:

> If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education[] may testify thereto in the form of an opinion or otherwise.

Under MRE 104(a), "[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court . . . ."

We cannot conclude that the trial court's allowance of Dr. Frankel's testimony violated the abuse of discretion standard. Indeed, Frankel testified that he had worked in emergency medicine for nearly twenty years and had also completed a residency in internal medicine. He testified that he "had five years of residency in internal medicine and surgery," and he graduated from medical school in 1964. Under these cir-

cumstances, it can reasonably be inferred that Frankel had "knowledge, skill, experience, training, or education" relevant to issues of a person's general health and life expectancy. See MRE 702. While he may not have been *as* qualified to render an opinion of life expectancy as was defendants' expert, this was relevant to the weight, not the admissibility, of his testimony. See *People v Whitfield*, 425 Mich 116, 123-124; 388 NW2d 206 (1986).[7]

III

Next, defendants argue that the trial court erroneously instructed the jury in accordance with a statutory mortality table that was repealed in 1994. However, defendants did not object to the reading of the challenged instruction at trial. Accordingly, we review this issue for plain error.[8] See, generally, *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000). To obtain relief, defendants must demonstrate a clear or obvious error that affected the outcome of the case. *Id.*; *People v Carines*, 460 Mich 750,

---

[7] Defendants briefly suggest in their briefs that Frankel was not qualified to express an opinion regarding whether Shinholster would have died if Adams and Flaherty had treated her differently. Defendants waived this issue by failing to develop an argument with respect to it and by failing to raise it in the questions presented on appeal. See *Caldwell v Chapman*, 240 Mich App 124, 132; 610 NW2d 264 (2000), and *Palo Group Foster Care, Inc v Dep't of Social Services*, 228 Mich App 140, 152; 577 NW2d 200 (1998).

[8] Defendants contend that their failure to object should be excused because the Standard Jury Instructions were not amended to reflect the abrogation of the mortality table until after the trial. We disagree; indeed, defendants should not have unhesitatingly relied on the Standard Jury Instructions, which do not have the force and effect of law. See *State Farm Fire & Cas Co v Couvier*, 227 Mich App 271, 273 n 1; 575 NW2d 331 (1998).

763; 597 NW2d 130 (1999). We conclude that defendants have not met this burden for reversal.

The trial court instructed the jurors, in part, as follows:

> [Y]ou may consider the mortality tables which are part of our statutes. This table shows that an ordinary person of 61 years of age has the life expectancy of 15.44 years.[9] This mortality table may be considered along with the other evidence in determining life expectancy. These mortality figures are to be considered in determining life expectancy only if you find that Betty Jean Shinholster was in ordinary good health.

This instruction derived from former SJI2d 53.02, which in turn derived from the mortality table found in former MCL 500.834(7). 1994 PA 226 eliminated the mortality table. Therefore, the trial court should not have given the above instruction at the 1999 trial.

While the error here could potentially be deemed clear or obvious (given the abrogation of the mortality table), it did not, in our opinion, affect the outcome of the case. Indeed, the trial court specifically noted that the "mortality figures are to be considered in determining life expectancy only if you find that Betty Jean Shinholster was in ordinary good health." The testimony at trial was abundantly clear that Shinholster was *not* in fact in ordinary good health because she had suffered from blood-pressure problems for many years. Under these circumstances,

---

[9] We note that plaintiff's expert opined a life expectancy of ten to fifteen years, defendants' expert opined a life expectancy of five years, and the jury ultimately found a life expectancy of eight years.

the use of the mortality table did not affect the outcome of the case and thus does not require reversal.[10]

IV

Next, defendants argue that the trial court erred in applying the $500,000 noneconomic damages cap under MCL 600.1483 because Shinholster did not meet the necessary qualifications for the higher cap. This issue involves statutory construction and is thus subject to review de novo. See *Keweenaw Bay Outfitters & Trading Post v Dep't of Treasury*, 252 Mich App 95, 97; 651 NW2d 138 (2002).

MCL 600.1483 states, in part:

> (1) In an action for damages alleging medical malpractice by or against a person or party, the total amount of damages for noneconomic loss recoverable by all plaintiffs, resulting from the negligence of all defendants, shall not exceed $280,000.00 unless, as the result of the negligence of 1 or more of the defendants, 1 or more of the following exceptions apply as determined by the court pursuant to section 6304 [dealing with postverdict adjustments by the court], in which case damages for noneconomic loss shall not exceed $500,000.00:
>
> (a) The plaintiff is hemiplegic, paraplegic, or quadriplegic resulting in a total permanent functional loss of 1 or more limbs caused by 1 or more of the following:
>
> (i) Injury to the brain.
> (ii) Injury to the spinal cord.
>
> (b) The plaintiff has permanently impaired cognitive capacity rendering him or her incapable of making indepen-

---

[10] Moreover, we note that Annapolis Hospital actually *offered* the challenged instruction at trial. As noted in *Fellows v Superior Products Co*, 201 Mich App 155, 165; 506 NW2d 534 (1993), "It is well settled that error requiring reversal must be that of the trial court and not that to which the appellant contributed by plan or negligence."

dent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living.

(c) There has been permanent loss of or damage to a reproductive organ resulting in the inability to procreate.[11]

The trial court noted that although the Legislature used the words "is . . . hemiplegic," etc., it did not specify at which time the plaintiff must have been in that state for the higher cap to apply. The court ruled:

[T]he the only sensible way to interpret the statute is to hold that the Legislature intended it [the higher cap] to apply to people who had been rendered cognitively incapable, quadriplegic, etc., from the accident in question. Betty Shinholster met this condition here: as the jury found, she suffered the requisite injuries from the accident—she endured these injuries in the several months she lay in a coma before she died. We thus hold that the higher, $500,000 cap applies.

Defendants contend that this was an improper interpretation because the statute specifically uses the present tense and because the damages reduction is to be performed by the court after the jury has rendered its verdict. Defendants contend that because Shinholster was dead at the end of trial, she did not fit within the present-tense definition of the statute.

The primary goal of statutory interpretation is to ascertain and give effect to the Legislature's intent as gleaned from the statute's language. See *Michigan Bell Tel Co v Dep't of Treasury*, 229 Mich App 200, 207; 581 NW2d 770 (1998). "If reasonable minds can differ with respect to the meaning of a statute, judi-

---

[11] We note that an earlier statute specifically mentioned death as an exception, but the current statute, in effect at the time of trial, does not.

cial construction is appropriate." *Alma Piston Co v Dep't of Treasury*, 236 Mich App 365, 368; 600 NW2d 144 (1999).

We believe that reasonable minds could differ with respect to the meaning of the statute in question. Indeed, while defendant argues that whether the injured person is hemiplegic, etc., should be determined at the time the court makes postverdict adjustments, another reasonable interpretation is possible, i.e., that the court, at the time of making postverdict adjustments, must determine whether the defendant's negligence caused the plaintiff *at some point* to fall within one of the enumerated conditions. Accordingly, given the unclear nature of the statute, judicial construction is appropriate. *Id.*

We construe the statute in accordance with the trial court's ruling. Indeed, the adoption of defendants' position would lead to absurd and unfair results. For example, a person who endured months of paraplegia caused by medical malpractice but died of an unrelated and independent cause before the court's verdict adjustments would be subject to the lower cap, whereas a similar person who died a day *after* the court's verdict adjustments would be subject to the higher cap. We view the better approach to be that advocated by plaintiff and adopted by the trial court. Under this approach, the point of reference for determining whether the injured person fits within MCL 600.1483(1)(a), (b), or (c) is *any time after and as a result of* the negligent action. Therefore, because Shinholster was rendered incapacitated by defendants' negligence, the higher cap applies.[12]

---

[12] An argument could be made that in a lawsuit involving death brought under the wrongful death statute, the damages caps found in MCL

Defendant hospital[13] argues that even if the higher cap applies by virtue of Shinholster's coma, then a remand for a new trial on damages is nonetheless warranted because the jury did not delineate between the noneconomic damages awarded to Shinholster for her coma and the noneconomic damages awarded to Shinholster's survivors for her death.[14] Defendant hospital contends that only the damages associated with the coma should be subject to the higher cap. We do not agree. The statute states that noneconomic damages shall not exceed $500,000 if the plaintiff meets one of the enumerated conditions but does not dictate that only the damages directly associated with the enumerated conditions shall be subject to the higher cap. We believe that, under the plain language of the statute, if a plaintiff falls within an enumerated condition, the total noneconomic damages associated with the malpractice, including damages resulting from an accompanying death, are subject to the higher cap.

Defendants contend that our holding with respect to MCL 600.1483(1) will result in a windfall (i.e., a higher damages cap) to individuals who suffer only brief paraplegia or another qualifying condition under the statute before their deaths. However, it is up to the Legislature, and not the courts, to address the concerns raised by defendants. If the Legislature wishes to amend MCL 600.1483 by making more spe-

---

600.1483(1) do not apply at all. We decline to reach this issue, however, because plaintiff only briefly mentions it in his appellate brief. Instead, plaintiff focuses on his argument that the trial court properly applied "the higher of the two limitations" found in MCL 600.1483(1).

[13] The individual doctors did not raise this issue in their appellate brief.

[14] Defendant seems to assume that one can experience loss of consortium or companionship only as the result of a relative's death and not as the result of a relative's coma.

cific rules regarding compensation for the conditions currently enumerated in the statute, it is free to do so.[15]

V

Next, defendants argue that the trial court erred in failing to reduce the jury's award of future damages to present value under MCL 600.6306. This issue involves statutory interpretation, which we review de novo. *Keweenaw Bay Outfitters, supra* at 97.

MCL 600.6306(1)(c), (d), and (e) mandate that awards of future damages be reduced to "gross present cash value." However, MCL 600.6311 states that this rule does not apply "to a plaintiff who is 60 years of age or older at the time of judgment." The trial court ruled that the term "plaintiff" in MCL 600.6311 referred to the decedent in a wrongful death case such as the instant one and that because Shinholster would have been over sixty at the time of judgment, MCL 600.6306(1)(c), (d), and (e) did not apply.

The general rule of statutory construction is to construe unambiguous statutes as written. *PM One, Ltd v Dep't of Treasury*, 240 Mich App 255, 280; 611 NW2d 318 (2000). MCL 600.6311 specifically refers to "a *plaintiff* who is 60 years of age or older . . ." (emphasis added). Accordingly, we could potentially hold that because the plaintiff here—Shinholster's personal

---

[15] Moreover, as noted in footnote 12, it is possible that in a lawsuit involving death brought under the wrongful death statute, the damages caps found in MCL 600.1483(1) do not apply at all; this would expose defendants to a significantly higher liability and result in greater compensation to a deceased individual's estate. As noted, we do not reach this question in the instant case because it has not been properly briefed by plaintiff.

representative—was over sixty, the MCL 600.6311 exception applied. However, we note that MCL 600.6306 also uses the term "plaintiff" in referring to comparative negligence. See MCL 600.6306(3) ("the total judgment amount shall be reduced . . . by an amount equal to the percentage of plaintiff's fault"). Clearly, this reference to "plaintiff" is not a reference to a personal representative in a wrongful death case, because the personal representative would not be the one evaluated for comparative negligence; instead, the decedent would be so evaluated. We conclude that the statutes at issue are essentially ambiguous with regard to the term "plaintiff" as applied to wrongful death cases.

However, it is not necessary, in the instant case, to resolve the ambiguity in MCL 600.6311. Indeed, both the "plaintiff" (i.e., the personal representative and the person who brought the lawsuit) and the decedent in this case satisfied the MCL 600.6311 exception. Accordingly, the trial court did not err in refusing to reduce the amount of future damages to present value.[16]

VI

Next, defendants argue that the trial court erred in failing to grant defendants a reduction in the past economic damages award in this case under MCL

---

[16] Defendants contend that a reduction should occur in this case because many of Shinholster's relatives are young and can invest the future damages award to make their own interest on the money. Essentially, defendants contend that MCL 600.6311 should not apply in wrongful death cases in which young beneficiaries exist. However, this Court is not at liberty to create an exception for certain wrongful death cases when such an exception is not apparent from the statutory language.

600.6303(1) because Medicaid paid much of the medical expenses. Once again, this issue involves statutory interpretation and is reviewed de novo. See *Keweenaw Bay Outfitters, supra* at 97.

MCL 600.6303(1) directs the trial court to reduce economic damages awards by the amount a plaintiff receives from a collateral source. MCL 600.6303(4) defines "collateral source" as

> benefits received or receivable from an insurance policy; benefits payable pursuant to a contract with a health care corporation, dental care corporation, or health maintenance organization; employee benefits; social security benefits; worker's compensation benefits; or medicare benefits. Collateral source does not include life insurance benefits or benefits paid by a person, partnership, association, corporation, or other legal entity entitled by law to a lien against the proceeds of a recovery by a plaintiff in a civil action for damages. Collateral source does not include benefits paid or payable by a person, partnership, association, corporation, or other legal entity entitled by contract to a lien against the proceeds of a recovery by a plaintiff in a civil action for damages, if the contractual lien has been exercised pursuant to subsection (3) [setting forth time deadlines for exercising contractual liens].

The relevant question is whether the Medicaid payments fit within this definition of "collateral source." Clearly, they do not. Indeed, Medicaid payments are simply not listed in the statute. Adams and Flaherty point out that the Medicaid program has been established under a federal statutory scheme that is a part of the Social Security Chapter of the United States Code. They therefore argue that Medicaid payments fall within the scope of MCL 600.6303(4) as "social security benefits." We disagree. Indeed, MCL 600.6303(4) refers to "social security benefits" *and* to

Medicare payments, even though the Medicare program has also been established under a federal statutory scheme that is part of the Social Security Chapter of the United States Code. Under the doctrine of *expressio unius est exclusio alterius,* the express mention of one thing implies the exclusion of other, similar things. *Dave's Place, Inc v Liquor Control Comm,* 277 Mich 551, 555; 269 NW 594 (1936); *Elliott v Genesee Co,* 166 Mich App 11, 15; 419 NW2d 762 (1988). Accordingly, the Legislature's express mention of Medicare payments implies the exclusion of Medicaid payments. The court did not err[17] in denying defendants' request for a setoff under MCL 600.6303(1).[18]

VII

Finally, defendant hospital[19] argues that the trial court erred in ruling that it would apply the statutory damages cap *after* it adjusted the jury verdict in accordance with Shinholster's comparative negligence. Upon our review de novo of this statutory interpretation issue, see *Keweenaw Bay Outfitters, supra* at 97, we disagree.

Under MCL 600.6304(3), a trial court is to determine the final award of damages in accordance with

---

[17] Although the court denied a setoff for a different reason, this Court will not reverse if a trial court reaches the right result for the wrong reason. *Etefia v Credit Technologies, Inc,* 245 Mich App 466, 470; 628 NW2d 577 (2001).

[18] We note that under MCL 400.106(1)(b)(ii), Medicaid can enforce a subrogation right by intervening in a lawsuit or by filing its own lawsuit against the allegedly negligent parties or against contractors that may be liable to pay for medical care.

[19] The individual doctors did not raise this issue in their appellate brief.

the jury's findings with regard to fault. MCL
600.6304(3) states, in part:

> The court shall determine the award of damages to each
> plaintiff in accordance with the findings under subsection
> (1) [regarding the total amount of damages and allocations
> of fault], *subject to any reduction* under subsection (5).
> [Emphasis added.]

Subsection 5 concerns the statutory damages caps in
medical malpractice cases. Therefore, the statute
makes clear that a court is to make a comparative
negligence reduction, with the result then being "sub-
ject" to the damages caps. The statutory language is
clear, and we will thus apply it as written. See *PM
One, supra* at 280. Accordingly, the trial court did not
err in its determination.

Affirmed and remanded for the entry of a judgment
in a sum certain consistent with this opinion. We do
not retain jurisdiction.