# STATE OF MICHIGAN

# COURT OF APPEALS

BURT HOLT,

      Plaintiff-Appellee,

v

AMARILD USHE and RELIABLE
TRANSPORTATION SPECIALISTS, INC.,

      Defendants-Appellants,

and

CONTAINERPORT GROUP, INC.,

      Defendant.

UNPUBLISHED
May 23, 2017

No. 330076
Wayne Circuit Court
LC No. 12-007202-NI

Before: TALBOT, C.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

Defendants-appellants, Amarild Ushe (Ushe) and Reliable Transportation Specialists Inc. (Reliable), appeal by right an order denying their post-trial motions following a jury verdict in favor of plaintiff Burt Holt (plaintiff). Finding no errors requiring reversal, we affirm.

## I. BASIC FACTS

Plaintiff is a truck driver who was injured while at Containerport Group Inc. (CPG). CPG is a facility that stores, repairs and inspects equipment as it comes in and out of the depot. CPG has a "shed" or "canopy" at its entrance. Truck drivers are required to stop and have their vehicles inspected in one of two lanes. On March 3, 2011, plaintiff was at CPG in the second of two inspection lanes. He was out of his vehicle while CPG employees conducted an inspection of his rig. In lane one was Ushe's rig. Ushe drove for Reliable and was likewise undergoing an inspection of his rig. After receiving his inspection papers, Ushe re-entered his truck and began to drive away. The rear tires of Ushe's vehicle struck plaintiff, who was standing between the two trucks, causing his body to twist and plaintiff fell to the ground. Plaintiff suffered a severe injury to his right leg.

Plaintiff originally sued Ushe and Reliable, claiming that Ushe was negligent (and Reliable was therefore vicariously liable) in pulling the rig out of the inspection lane when Ushe knew or should have known that plaintiff was in the "zone of danger." Ushe/Reliable filed a

-1-

notice of third-party fault, claiming that CPG was negligent in failing to properly monitor and control ingress and egress of the vehicles it inspected. Plaintiff later amended his complaint to include allegations that CPG was negligent in the manner in which it conducted inspections.

There was a 10-day jury trial over the course of three weeks. Plaintiff's theory of the case was that Ushe was negligent when he pulled his vehicle out of the inspection without regard to plaintiff's safety and that CPG placed truck drivers in a perilous position by requiring them to exit their vehicles during inspection without implementing or maintaining any policies or procedures for the protection of the drivers. Collectively, defendants argued that plaintiff was comparatively negligent because he was on his cell phone at the time of the accident and failed to use reasonable care for his own safety. They argued that plaintiff effectively placed himself in the path of Ushe's vehicle. The nature and extent of plaintiff's injuries were hotly contested. Defendants, utilizing what plaintiff's counsel referred to as a "fat defense," argued that plaintiff, who was 5'9 and over 300 pounds at the time of the accident, suffered severe injury because he was particularly susceptible and because he had a number of pre-existing conditions that complicated his recovery. However, it must be noted that defendants presented no medical testimony to dispute plaintiff's injuries other than their cross-examination of plaintiff's medical experts.

The jury concluded that Ushe and Reliable were 50% at fault, CPG was 40% at fault and plaintiff was 10% at fault for the accident. It awarded plaintiff $6,000,000 in past non-economic loss and over $15,000,000 for future non-economic loss. On July 28, 2015, the trial court entered an order of judgment reflecting that plaintiff's past and future economic damages were $386,360.57 and his past and future non-economic damages were $16,984,331.90 for a total judgment of $17,370,692.47, which was reduced by 10% to reflect plaintiff's comparative fault.

The trial court denied a number of post-trial motions. Ushe and Reliable filed a claim of appeal on November 6, 2015. CPG also filed a claim of appeal on November 12, 2015 and the two appeals were originally consolidated. However, a stipulation to dismiss CPG's appeal was entered on December 22, 2016. *Holt v Ushe*, unpublished order of the Court of Appeals, entered December 22, 2016 (Docket No. 330202).

## II. REMITTITUR/NEW TRIAL BASED ON AN EXCESSIVE VERDICT

Ushe and Reliable argue that the trial court erred when it denied their motion for remittitur or new trial. We disagree.

> [T]he question of the excessiveness of a jury verdict is generally one for the trial court in the first instance. The trial court, having witnessed all the testimony and evidence as well as having had the unique opportunity to evaluate the jury's reaction to the proofs and to the individual witnesses, is in the best position to make an informed decision regarding the excessiveness of the verdict. Accordingly, an appellate court must accord due deference to the trial court's decision and may only disturb a grant or denial of remittitur if an abuse of discretion is shown. [*Palenkas v Beaumont Hosp*, 432 Mich 527, 531; 443 NW2d 354 (1989).]

"An abuse of discretion occurs when a court chooses an outcome that is outside the range of principled outcomes." *Heaton v Benton Const Co*, 286 Mich App 528, 538; 780 NW2d 618 (2009).

Ushe and Reliable challenge only the jury's non-economic damages award. The jury awarded plaintiff $6,000,000 in past non-economic loss and over $15,000,000 for future non-economic loss ($750,000 every year from 2016-2035). The trial court's judgment reflects that plaintiff's total past and future non-economic damages are $16,984,331.90, which is reduced by 10% to reflect plaintiff's comparative fault. CPG's portion of the non-economic loss is $6,919,164.13, while Ushe/Reliable's portion is $8,735,142.35.

MCR 2.611(1)(c) and (d) provides:

(1) A new trial may be granted to all or some of the parties, on all or some of the issues, whenever their substantial rights are materially affected, for any of the following reasons:

***

(c) Excessive or inadequate damages appearing to have been influenced by passion or prejudice.

(d) A verdict clearly or grossly inadequate or excessive. [See also MCL 600.6098(2)(b)(iv) and (v).]

"The only consideration *expressly* authorized by [the court rule] . . . is whether the jury award is supported by the evidence." *Palenkas*, 432 Mich at 532. Whether an award "shocks the conscience" is not an appropriate consideration because it is wholly subjective. *Id.* While a trial court should consider, for example, whether bias or prejudice influenced the award, it must do so based only on "*objective* considerations relating to the actual conduct of the trial or to the evidence adduced." *Id.* To the extent that they are objectively verifiable, a trial court may consider: (1) whether the award was obtained by "improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact"; (2) whether the award was within the limits of what reasonable minds would find to be just compensation for the injury; and, (3) whether the award is comparable to awards in similar cases. *Id.*

"The power of remittitur should be exercised with restraint." *Silberstein v Pro-Golf of Am, Inc*, 278 Mich App 446, 462; 750 NW2d 615 (2008). "When deciding whether to grant a motion for remittitur, the trial court must examine all the evidence in the light most favorable to the nonmoving party to determine whether the evidence supported the jury's award." *Taylor v Kent Radiology*, 286 Mich App 490, 522; 780 NW2d 900 (2009). Where, as here, "a jury verdict is based in part upon pain and suffering, a trial court must balance all of the factors involved against the general principle that there is no absolute mathematical formula or standard by which pain and suffering can be measured; thus, the amount allowed for pain and suffering must ordinarily rest in the sound judgment of the jury." *Palenkas*, 432 Mich at 556. "If the award for economic damages falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, the jury award should not be disturbed." *Silberstein*, 278 Mich App at 462.

Ushe and Reliable cite *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 765; 685 NW2d 391 (2004):

> When a verdict is procured through improper methods of advocacy, misleading argument, or other factors that confound the jury's quantification of a party's injuries, that amount is inherently unreliable and unlikely to be a fair estimate of the injured party's losses. Likewise, when a verdict is unsupported by the record or entirely inconsistent with verdicts rendered in similar cases, a reviewing court may fairly conclude that the verdict exceeds the amount required to compensate the injured party. [*Id.* at 765.]

They rely on this passage and focus solely on the third prong of the *Palenkas* test – whether the amount actually awarded was comparable to awards in similar cases. In so doing, they effectively ignore the evidence supporting the jury's verdict. Instead, Ushe and Reliable spend an inordinate amount of time setting forth a general survey of Michigan personal injury verdicts as well as a survey of reported verdicts for automobile negligence cases to demonstrate that the award in this case was "far outside the realm of what reasonable minds would deem just compensation for the kind of injuries Holt sustained." However, "[t]he only consideration *expressly* authorized by [the court rule] . . . is whether the jury award is supported by the evidence." *Palenkas*, 432 Mich at 532. "There may be some cases in which it is possible to determine objectively that a compensatory award is or is not supported by the record." *Gilbert*, 470 Mich at 767. How an award compares with other cases is only one consideration; the starting point and the primary focus should be on the evidence produced at trial.

Viewing the evidence in a light most favorable to plaintiff, plaintiff's injuries include not only the original ankle injury, which has never properly healed, and a traumatic brain injury, but also numerous other injuries stemming from complications of recovery, such as knee, shoulder, and back problems. By all accounts at trial, plaintiff was an active individual with a robust work habit prior to the accident, which had debilitating and permanent consequences. Plaintiff testified regarding the effect of these injuries on his life. He was unable to care for himself and was placed in a residential assisted living facility after being released from the hospital. At that time, plaintiff was basically an "invalid" and felt "worthless." It took five months before plaintiff was able to live on his own. In the meantime he was "sitting there. Wasn't nothing to do" but try and heal.

Plaintiff testified that he wears sunglasses all of the time because his eyes are "messed up." He sees floaters and spots. He has chronic headaches. These problems started near the time plaintiff suffered from the pulmonary emboli. Plaintiff was doing his best to get better but it felt like "a waste of time," and plaintiff had been in pain every day since the March 2011 accident. Plaintiff was trying to make the best out of it but there was little he could do but sit around. He only had transportation for doctors' appointments. It was hard for plaintiff to get around and he was on a long list of medications. He took a narcotic for pain, but it was "like taking a baby aspirin." The pain at night would often interfere with his sleep.

The physicians who treated and evaluated plaintiff confirmed that he continued to live with pain. Dr. Rahoul Vaidya saw plaintiff every two or three months. Vaidya testified that plaintiff continued to experience pain and discomfort from his injuries and the pain was chronic.

Vaidya explained that trauma can take three to five years to recover from, but that plaintiff did not seem to be making any progress and "it's probably not going to improve dramatically, maybe a little bit." Dr. Mary Miller had treated plaintiff for a significant time at the rehabilitation center. She noted that plaintiff suffered from chronic pain and depression, which was a common side effect of chronic pain. In fact, plaintiff's depressive symptoms were so severe that Miller referred plaintiff to Dr. Daniel Rataj to evaluate whether plaintiff had a traumatic brain injury. Miller testified that plaintiff would likely suffer ongoing pain and disability from his injuries every single day for the rest of his life and that it was unlikely that plaintiff would ever recover. He would need ongoing medical care and medications and faced a number of future surgeries depending on how his joints held up. Rataj found plaintiff's depression to be "striking" and obvious at their first meeting. Plaintiff appeared socially withdrawn and extremely sad. Rataj noted that plaintiff's injuries changed plaintiff's life. He went from being very motivated and a high achiever but now lacked the energy to function at the same level. Plaintiff suffered headaches, dizziness, sensitivity to sound and light, depression, and anxiety; he suffered from anhedonia, which was the inability to experience pleasure. Plaintiff also had thoughts about killing himself. Rataj agreed that it was unlikely plaintiff would ever recover. He was also at a greater risk of developing dementia. Dr. Gerald Shiener agreed that plaintiff suffered from chronic pain and depression. He had trouble sleeping and the lack of restorative sleep caused him to lose initiative. Chronic pain also caused negative thinking and general misery – "You can't see that you'll ever feel any better." Plaintiff had poor memory, poor concentration, irritability, and social withdrawal. He was extremely frustrated with himself. Every aspect of plaintiff's life was affected by the accident. Finally, Dr. Antoine Geffrard testified that there was no doubt plaintiff continued to suffer irretractable pain without interruption.

The evidence at trial provided objective support for the jury's ultimate award. There is no indication that the jury's verdict was the result of passion or bias.

Ushe and Reliable complain that plaintiff's comments during closing argument urged the jury to do more than simply compensate plaintiff for his injuries. However, we have examined the record and can determine nothing inappropriate about counsel's arguments. Moreover, the fact that the jury awarded less than what plaintiff's counsel requested indicates that the jury deliberated the issue appropriately and was not influenced by passion or prejudice.

Next, Ushe and Reliable argued that the award was the culmination of errors and irregularities at trial but, as discussed below, there were either no errors or errors that were harmless. There is no support for the claim that irregularities resulted in an excessive award.

Finally, Ushe and Reliable make a constitutional argument, arguing that a grossly excessive award for pain and suffering may violate a defendant's due process rights. Again, they rely on a footnote from *Gilbert*:

> There is also an overarching constitutional issue to consider. In *State Farm Mut Automobile Ins. Co v Campbell,* 538 US 408, 416; 123 S Ct 1513; 155 L Ed 2d 585 (2003), the United States Supreme Court concluded that "[t]he Due Process Clause of the [United States Constitution's] Fourteenth Amendment prohibits imposition of grossly excessive or arbitrary punishments on a tortfeasor." While *State Farm* dealt with punitive damage awards, the due process

concerns articulated in *State Farm* are arguably at play regardless of the label given to damage awards. A grossly excessive award for pain and suffering may violate the Due Process Clause even if it is not labeled "punitive." In this case, however, there is no need to reach this constitutional question, given the necessity of reversal on other grounds. [*Gilbert*, 470 Mich at 765 n 22.]

Unlike other cases where a panel of this court is tasked with determining whether language in an opinion constitutes dicta, the plain language of the foregoing passage makes clear that "there is no need to reach this constitutional question." "Stare decisis does not arise from a point addressed in obiter dictum." *Griswold Properties, LLC v Lexington Ins Co*, 276 Mich App 551, 563; 741 NW2d 549 (2007). Moreover, the facts in *Gilbert* are not on point with the case at bar. Our Supreme Court in *Gilbert* determined that the plaintiff's $20 million award for non-economic damages was excessive because "[n]ot only does the verdict exceed verdicts in similar cases by leaps and bounds, but, as shown in this opinion, it was awarded by a jury inflamed by hyperbolic rhetoric, prejudice-baiting argument, and unscientific expert testimony." *Gilbert*, 470 Mich at 770. For example, the plaintiff's attorney in *Gilbert* engaged in "inflammatory rhetoric" by deliberately trying to "provoke the jury by supplanting law, fact, and reason with prejudice, misleading arguments, and repeated ad hominem attacks against defendant based on its corporate status" and by comparing the plaintiff to victims of the Holocaust. *Id.* at 770-771. Here, plaintiff's attorney did not ask the jury to suspend reason and award plaintiff a large verdict in order to punish defendants; instead, counsel asked the jury to consider the nature and extent of plaintiff's injuries and the lifelong effect those injuries would have. After a thorough examination of the lower court record, there is nothing objectionable about counsel's behavior.

## III. EVIDENCE OF AN INDEMNIFICATION AGREEMENT AND THE NOTICE OF NON-PARTY FAULT

Ushe and Reliable argue that the trial court erred in allowing testimony regarding the meaning of an alleged indemnity agreement between CPG and Reliable and that the trial court also erred in allowing plaintiff to admit the notice of non-party fault into evidence. We conclude that there was nothing erroneous regarding the indemnification testimony and, while we agree with Ushe and Reliable that the notice of non-party fault should not have been admitted into evidence, such error was harmless.

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). "A court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law. However, any error in the admission or exclusion of evidence will not warrant appellate relief unless refusal to take this action appears inconsistent with substantial justice, or affects a substantial right of the opposing party." *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004) (footnotes omitted). MCR 2.613(A) provides:

> An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.

The test is whether the error was harmless.  *Chastain v Gen Motors Corp*, 467 Mich 888; 654 NW2d 326 (2002).

Plaintiff's attorney, responding to the so-called "fat defense," argued that Ushe and Reliable and CPG had previously blamed one another for the accident and then changed course and placed all of the blame on plaintiff.  Counsel noted that in the notice of non-party fault, Ushe and Reliable claimed that CPG was negligent for failing to properly manage the ingress and egress of vehicles in its facility but that it had abandoned that claim at trial, likely due to the fact that Reliable would be responsible for all damages under an indemnification agreement.  Contrary to Ushe and Reliable's position on appeal, plaintiff's intent was not to argue for an inflated jury award by implying that Reliable would not have to pay the judgment; instead, counsel was merely trying to demonstrate how and why the defendants took the positions they did.

"Generally, all relevant evidence is admissible and irrelevant evidence is not.  Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence."  *Morales v State Farm Mut Auto Ins Co*, 279 Mich App 720, 729–730; 761 NW2d 454 (2008), citing MRE 402 and 401.

> Relevance divides into two components: materiality and probative value. Material evidence relates to a fact of consequence to the action. A material fact need not be an element of a crime or cause of action or defense but it must, at least, be in issue in the sense that it is within the range of litigated matters in controversy. Materiality looks to the relation between the propositions that the evidence is offered to prove and the issues in the case. If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial.  [*Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 667; 819 NW2d 28, 37 (2011) (citations and quotation marks omitted).]

"Evidence bearing on a witness's credibility is always relevant."  *In re Dearmon*, 303 Mich App 684, 696; 847 NW2d 514 (2014); see also *Powell v St John Hosp*, 241 Mich App 64, 73; 614 NW2d 666 (2000).  However, MRE 403 provides that even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Ushe and Reliable first argue that the indemnification was inadmissible under MCL 500.3030 and MRE 411.  To be clear, there was no evidence of an actual indemnification between Reliable and CPG, as seems to be implied by the parties on appeal.  Daniel Davis, CPG's safety and risk management officer, testified that he *believed* that Reliable, in order to have access to the equipment at CPG, would have to be a party to a contract called the Uniform Intermodal Interchange Agreement (UIIA).  The agreement would have been between Reliable and the Intermodal Association of North America; there was no direct agreement between the parties.  The agreement outlines the relationship between motor carriers like Reliable and equipment providers like CPG.  MCL 500.3030 provides:

In the original action brought by the injured person, or his or her personal representative in case death results from the accident, as mentioned in section 3006, the insurer shall not be made or joined as a party defendant, nor, except as otherwise provided by law, shall any reference whatever be made to such insurer or to the question of carrying of such insurance during the course of trial. [Footnote omitted.]

MRE 411 provides:

Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, if controverted, or bias or prejudice of a witness.

At issue is whether an indemnification agreement is the same as insurance under the rule and statute.

Ushe and Reliable cite *Garvin v Detroit Bd of Ed*, unpublished opinion per curiam of the Court of Appeals, issued June 16, 2015 (Docket No. 319557), in support of their position that indemnification agreements are treated the same as insurance. In *Garvin*, a panel of this Court held:

Although the remainder of the issues raised by defendants are rendered moot by our ruling, we will address one argument posed by defendants to avoid error in the new trial. Evidence that the individual defendants might be indemnified for any judgment entered against them is not admissible, just as evidence of the existence or nonexistence of liability insurance is not admissible under MRE 411. The issue of indemnification, like the issue of liability insurance, is irrelevant because it " 'tends to influence and prejudice jurors by imparting to them the information that whatever verdict they may render will be immaterial to the defendant, since he will not have to pay for it.' " *Id.* at 521–522, quoting 29 Am Jur 2d, Evidence, § 404, p. 458. See *Felsner v McDonald Rent–A–Car, Inc*, 173 Mich App 518; 434 NW2d 178 (1988). If a party raises an objection to another party's attempt to question a witness about indemnification, the appropriate remedy is a curative instruction advising the jury that the question of indemnification has no bearing on any issue in the case and that it must refrain from any inference, speculation, or discussion about indemnification. [*Id.* at slip op, p 6 (footnote omitted.]

*Garvin*, as an unpublished opinion, has no precedential value. MCR 7.215(C)(1). The panel's one-paragraph analysis flies in the face of the plain language of MRE 411. An appellate court "uses the principles of statutory construction when interpreting a Michigan court rule. We begin by considering the plain language of the court rule in order to ascertain its meaning." *Henry v Dow Chem Co*, 484 Mich 483, 495; 772 NW2d 301 (2009).

The primary goal when interpreting a statute is to discern the intent of the Legislature by focusing on the most reliable evidence of that intent, the language of the statute itself. When legislative intent is clear from the language, no further construction is required or permitted. [*Fairley v Dep't of Corrections*, 497 Mich 290, 296–297; 871 NW2d 129, recon den 498 Mich 864 (2015).]

The plain language of the rule does not reference indemnification.

Moreover, *Garvin* is distinguishable from the case at bar. Evidence of a party's liability insurance is inadmissible because such evidence may result in large verdicts if the jury believes the defendants are not on the hook for the judgment. Here, evidence of an indemnification agreement was not admitted to inform the jury that CPG would not have to pay for any judgment nor was it used to show that a party acted negligently or wrongfully. Instead, plaintiff used the indemnification agreement to demonstrate how the various defendants were connected and how their theories of liability had shifted. This was proper to show Davis's bias as a witness. Davis testified that Ushe was not negligent under the circumstances. An indemnification agreement might explain why Ushe and Reliable's accident reconstructionist did not take into account CPG's conduct and, likewise, why CPG's accident reconstructionist did not factor in Ushe's conduct. Because there is no controlling case law that provides an indemnification agreement is the same as insurance under MRE 411 and because evidence of an indemnification agreement was used for a proper purpose, the trial court did not abuse its discretion regarding references to an indemnification agreement.

More problematic is the trial court's decision to allow the notice of non-party fault to be admitted into evidence as a "pleading." Ushe and Reliable filed the notice as a means of allocating fault under Michigan's tort reform. At trial, plaintiff sought to use the notice of non-party fault as an admission under MRE 801(d)(2). "[U]nder MRE 801(d)(2), statements in pleadings may be treated as admissions." *Hunt v CHAD Enterprises, Inc*, 183 Mich App 59, 63; 454 NW2d 188 (1990). However, MCR 2.110, which defines what a pleading is, is silent on a notice of non-party fault. The rule provides:

(A) Definition of "Pleading." The term "pleading" includes *only*:

(1) a complaint,

(2) a cross-claim,

(3) a counterclaim,

(4) a third-party complaint,

(5) an answer to a complaint, cross-claim, counterclaim, or third-party complaint, and

(6) a reply to an answer.

No other form of pleading is allowed. (Emphasis added.)

Therefore, the trial court erred when it concluded that the notice of non-party fault was admissible as a pleading.

Plaintiff concedes that the notice of non-party fault was not a pleading under MCR 2.110, but still maintains that it was "tantamount to a pleading" for which MRE 801(d)(2) applied. We disagree. There is a difference between a statement of fact or admission to which the rule applies and a mere allegation or alternative theory. *Larion v City of Detroit*, 149 Mich App 402, 406-407; 386 NW2d 199 (1986). Alternative pleadings are generally accepted and "a party should not be placed in the position of having to forego a claim at the risk of having inconsistent allegations treated as admissions." *Id.* at 407. The Court in *Larion* explained:

> Our decision is in accord with the trend described in McCormick on Evidence (3d ed, 1984), § 265, pp. 780-782:
>
> > "An important exception to the use of the pleadings in the case as admissions must be noted. A basic problem which attends the use of written pleadings is uncertainty whether the evidence as it actually unfolds at trial will prove the case described in the pleadings. Traditionally a failure in this respect, i.e., a variance between pleading and proof, could bring disaster to the pleader's case. As a safeguard against developments of this kind, the common law evolved the use of counts, each a complete separate statement of a different version of the same basic claim, combined in the same declaration, to take care of variance possibilities. The same was done with defenses. Inconsistency between counts or between defenses was not prohibited; in fact it was essential to the successful use of the system. Also essential to the success of the system was a prohibition against using allegations in one count or defense as admissions to prove or disprove allegations in another. For a time, under the influence of the Field Code of 1848, the view prevailed that in a given case there could exist only one set of facts and that inconsistent statements and defenses were therefore not allowable. Nevertheless, uncertainty has persisted as to how a case will in fact develop at trial, and some procedure is needed for dealing with problems of variance. The modern equivalent of the common law system is the use of alternative and hypothetical forms of statement of claims and defenses, regardless of consistency. It can readily be appreciated that *pleadings of this nature are directed primarily to giving notice and lack the essential character of an admission. To allow them to operate as admissions would render their use ineffective and frustrate their underlying purpose. Hence the decisions with seeming unanimity deny them status as judicial admissions, and generally disallow them as evidential admissions.*
> >
> > "The trend is to expand the application of the exception described above to the general rule of admissibility to include, not only the common law practice and modern hypothetical and alternative allegations, but in addition situations in which a more skillful pleader would have avoided the pitfalls of admissions by resorting to one of those techniques. * * *.

-10-

*The same trend is evident in cases involving separate actions against different defendants to recover for the same injury.* The trend is consistent with the prevailing view that the primary purpose of pleadings is to give notice and that alternative or hypothetical allegations are not usable as admissions, but the extent to which it will prevail is difficult to estimate." (Footnotes omitted; emphasis added.)

[*Larion*, 149 Mich App at 408–400.]

Defense counsel states it best in her appellate brief: "[T]he purpose of the non-party fault procedures is to provide a plaintiff with notice that another party may be at fault, not to lock a defendant into one position, preclude that defendant from any inconsistent allegations throughout the course of the proceedings, and deprive that defendant of its right to devise its own trial strategy."

However, although the trial court erred in allowing plaintiff to introduce the notice of non-party fault into evidence, the error was harmless because Ushe testified to the exact allegations contained within the notice:

*Q.* In paragraph one [of the notice of nonparty at fault] here's what is [sic] says, [CPG] is a nonparty at fault for failure to properly and adequately monitor the ingress and egress of vehicular traffic within the inspection area of CPG resulting in the accident that give [sic] rise to plaintiff's original complaint. Did I read that right?

*A.* Yes.

*Q.* You just told the jury you agreed with that. You think the way in which CPG had this whole thing set up caused and/or contributed to my client's accident and injury; don't you?

*A.* Yes.

*Q.* Wherefore, defendants; Amarild Ushe; that's you?

*A.* Yes.

*Q.* And Reliable Transportation Services, LLC respectfully request that this Honorable Court instruct the jury at the time of trial that they are to assess a percentage of fault attributable to the nonparty . . . You agree with that, don't you?

*A.* Yes.

* * *

*Q.* You agree with this statement by [the attorney] on your behalf that this accident in part is because of CPG and what they did wrong.

-11-

*A.* I don't write this.

*Q.* I know, but you agree. You already told me three times; agreed?

*A.* Yes.

*Q.* So you're not backing off that in this trial, are you?

*A.* No.

Even without the direct reference to the notice of non-party fault, Ushe's testimony confirms that he believed the situation at CPG was at least partially to blame for the accident. Any error was harmless.

## IV. GREAT WEIGHT OF THE EVIDENCE

Ushe and Reliable argue that the jury's verdict was against the great weight of the evidence and that plaintiff was at fault for the accident. They note that (1) plaintiff was on his cell phone at the time of the accident; (2) plaintiff was not wearing a reflective vest; (3) plaintiff should have been able to see Ushe's cab move; (4) plaintiff stood directly in the line of travel of Ushe's rear wheels; (5) plaintiff failed to appreciate the sound of Ushe starting his truck and releasing the air brake; and, (6) plaintiff had been to CPG on numerous occasions and knew that adjacent trucks moved forward once cleared by inspection. Ushe and Reliable contend that the jury was likely improperly influenced by impermissible expert testimony and that the jury was erroneously instructed regarding memory loss. We disagree with each of these claims.

Ushe and Reliable first argue that they were entitled to a directed verdict because the jury's comparative negligence finding was against the great weight of the "undisputed" evidence.

> We review for an abuse of discretion a trial court's denial of a motion for new trial. When a party challenges a jury's verdict as against the great weight of the evidence, this Court must give substantial deference to the judgment of the trier of fact. If there is any competent evidence to support the jury's verdict, we must defer our judgment regarding the credibility of the witnesses. [*Allard v State Farm Ins Co*, 271 Mich App 394, 406–407; 722 NW2d 268 (2006) (footnotes omitted).]

MCR 2.611(1)(e) provides that a new trial may be granted if the verdict is against the great weight of the evidence or contrary to law. "But a jury's verdict should not be set aside if there is competent evidence to support it," which requires a review of "the whole body of proofs." *Dawe v Bar-Levav & Assoc (On Remand)*, 289 Mich App 380, 401; 808 NW2d 240 (2010).

Ushe and Reliable cite *Modzel v Norwalk Truck Lines*, 325 Mich 693; 39 NW2d 226 (1949) in support of their claim that plaintiff placed himself in danger. However, *Modzel* was decided under the old contributory negligence standard, which has been replaced by the comparative negligence standard. *Placek v City of Sterling Hts*, 405 Mich 638, 650; 275 NW2d 511, 514 (1979) ("We hold, in the interest of justice for all litigants in this state, that the doctrine

-12-

of comparative negligence hereby replaces the doctrine of contributory negligence . . ."). Thus, while the plaintiff's contributory negligence acted as a complete bar, plaintiff's alleged comparative negligence in this case was considered and properly apportioned.

Defendants then discuss the evidence at trial, claiming that even plaintiff's own experts believed that plaintiff placed himself in the path of danger. Defendants claim that plaintiff's biomedical engineer expert, Dr. Jamie Williams, testified that plaintiff was the one who put himself in the position of standing within the path of Ushe's tires. But defendants provide an incomplete reference to Williams's testimony. On re-direct, she also testified:

> *Q.* He's only in the path if the truck moves.
>
> *A.* Correct.
>
> *Q.* If the truck stops because he's close enough because you see him in the rearview mirror, because he's anywhere near the rear wheel, the accident doesn't happen.
>
> *A.* Correct.

Ushe and Reliable also contend that plaintiff's accident reconstructionist, Timoth Abbo, testified that plaintiff placed himself in the path of the rear chassis tires. But, again, this is not a fair representation of Abbo's testimony. Abbo testified that the fact that Ushe was moving forward at the time of the accident indicated that plaintiff was positioned in front of the wheel before the truck moved and, therefore, was there to be seen if Ushe had checked his mirror. The mirrors were designed to look down the sides of the vehicle. If Ushe had actually looked, he would have seen plaintiff. There was no evidence that plaintiff walked into the wheel.

Ushe and Reliable's arguments regarding plaintiff's comparative fault is essentially a request that this Court usurp the jury's role in deciding matters of witness credibility. Even if plaintiff was negligent in all of the ways that they claim, there was ample evidence to support the jury's allocation of fault.

Ushe and Reliable next argue that the jury's comparative negligence finding was influenced by the trial court erroneously giving M Civ JI 10.09 regarding memory loss. Claims of instructional error are generally reviewed de novo. *Lewis v LeGrow*, 258 Mich App 175, 211; 670 NW2d 675 (2003). "MCR 2.516(D)(2) states that the trial court must give a jury instruction if a party requests such instruction, and it is applicable to the case. We review for abuse of discretion the trial court's determination whether a standard jury instruction is applicable and accurate." *Lewis*, 258 Mich App at 211.

The trial court gave this standard instruction:

> It is alleged that the plaintiff has a loss of memory concerning the facts of this case and it was caused by the occurrence. If you determine that the plaintiff had a loss of memory that was caused by the occurrence, you may infer that the plaintiff was not negligent, however, you should weight [sic] all the evidence in determining whether the plaintiff was or was not negligent.

-13-

There is nothing objectionable about this standard instruction, which advises the jury that *if* it believes that plaintiff suffered from memory loss as a result of the accident, it *may* infer that plaintiff was not negligent, but that the jury should still weigh *all the evidence* in determining plaintiff's comparative negligence.

Finally, Ushe and Reliable complain that the jury was improperly influenced by impermissible expert testimony. "[T]he qualification of a witness as an expert and the admissibility of the testimony of the witness are in the trial court's discretion and we will not reverse on appeal absent an abuse of that discretion." *Surman v Surman*, 277 Mich App 287, 304–305; 745 NW2d 802 (2007).

Ushe and Reliable complain that Abbo did not investigate the accident himself and did not perform any tests or obtain measurements. Instead, he simply observed CPG and relied on witnesses' testimony. However, these things were explored during cross-examination and the jury was made aware of any alleged deficiencies in Abbo's analysis. Issues of credibility, including evaluating expert testimony, "should be left for the fact-finder." *Dawe*, 289 Mich App at 401. It appears that, at least on appeal, Ushe and Reliable do not challenge Abbo's qualifications, only his opinions. Instead, Ushe and Reliable complain that the trial court impermissibly allowed Abbo to testify that defendants were liable while plaintiff was not. Abbo testified that plaintiff was not at fault for the accident. The trial court denied defendants' request for a curative instruction noting that the jury "can disregard his opinion."

Citing, *O'Dowd v Linehan*, 385 Mich 491; 189 NW2d 333 (1971), Ushe and Reliable argue that it was error to allow an accident reconstruction expert to testify as to the parties' fault. However, *O'Dowd* has been subsequently clarified.

> Waste Management argues that prejudice resulted because the accident reconstructionist improperly testified in such a way so as to fix fault or identify who was negligent. We disagree.
>
> Waste Management relies primarily on *O'Dowd v Linehan,* 385 Mich 491, 189 NW2d 333 (1971). We first note that *O'Dowd* was decided before the adoption of MRE 704, which states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Moreover, *O'Dowd* was one of the early cases dealing with accident reconstruction testimony and, as shown by the concurrence by Justice Williams, there was concern about the reliability and method of the expert in that case. The crucial issue in *O'Dowd* was which of two cars was in the wrong lane when the collision occurred, *id.* at 510, 189 NW2d 333, and the expert's attempt to describe the positions of the cars and his determination which driver had been in the wrong lane was what the Court viewed to be an attempt to "fix the blame" for the accident. *Id.* at 513, 189 NW 2d 333. Such testimony as to accident causation has become routine since the adoption of MRE 704 and we do not believe that *O'Dowd* should be read to bar an accident reconstructionist from testifying about what and whose actions caused the accident. See *Ruddock v Lodise,* 413 Mich 499; 320 NW2d 663 (1982) (expert testimony that the trial court improperly concluded, relying on *O'Dowd,* should

-14-

have been excluded because it embraced the ultimate issue to be decided by the jury was permissible under MRE 704 where the testimony could aid the jury in determining whether the defendant failed to maintain the road in a reasonably safe condition); see also *Portelli v IR Constr Products Co, Inc,* 218 Mich App 591, 602, 554 NW 2d 591 (1996) ("Plaintiff's expert found fault . . ."). Accordingly, the trial court did not abuse its discretion by permitting the accident reconstructionists to opine as to fault. [*Freed v Salas*, 286 Mich App 300, 337–338; 780 NW2d 844 (2009).]

The jury's verdict was not against the great weight of the evidence, was not the result of improper instructions, and was not the result of inappropriate expert testimony.

## V. INSTRUCTIONS ON COMPARATIVE FAULT RELATIVE TO PLAINTIFF'S DAMAGES

Ushe and Reliable argue that the jury verdict form and the instructions unduly emphasized that plaintiff's damages would be reduced by his comparative fault. This issue is unpreserved. "To preserve an instructional issue for appeal, a party must request the instruction before instructions are given and must object on the record before the jury retires to deliberate." *Heaton v Benton Const Co*, 286 Mich App 528, 537; 780 NW2d 618 (2009). "The failure to timely and specifically object precludes appellate review absent manifest injustice." *Id.*

Ushe and Reliable do not claim that there was an inaccurate statement of law; instead, they argue that the cumulative nature of the instructions and the verdict form unduly emphasized the issue of comparative fault and the resultant effect on a possible jury award. "[E]rror may result where the instructions to the jury are unnecessarily repetitive and argumentative." *Thon v Saginaw Paint Mfg Co*, 120 Mich App 745, 748; 327 NW2d 551 (1982). The *Thon* Court cited *Mack v Precast Industries, Inc,* 369 Mich 439; 120 NW2d 225 (1963), wherein the trial court instructed the jury 16 times that the plaintiff would be precluded from recovery if her decedent were guilty of contributory negligence, "however slight." The repetitious instruction was erroneous, not simply because it was repeated so frequently, but because the language "however slight" unduly emphasized the plaintiff's contributory negligence as it related to the defendants' negligence. Here, the instructions were legally correct and in keeping with the standard instructions. Moreover, "[j]ury instructions should be reviewed in their entirety, not extracted piecemeal to establish error in isolated portions." *Bachman v Swan Harbour Ass'n*, 252 Mich App 400, 424; 653 NW2d 415 (2002). Although Ushe and Reliable make it appear as though the trial court unnecessarily repeated comparative negligence instructions, it is clear upon reviewing the record that these instructions were properly given in light of the complexity of trial and the fact that there were multiple defendants and multiple theories of liability. Finally, even when there is instructional error, reversal is not warranted "if, on balance, the theories of the parties and the applicable law were adequately and fairly presented to the jury." *Murdock v Higgins*, 454 Mich 46, 59; 559 NW2d 639 (1997).

We decline Ushe and Reliable's request to find the standard instructions prejudicial as a matter of law because "the jury does not need the information imparted" where "the effect of a jury's comparative negligence finding is implemented by the trial judge, not the jury." Although jury instructions do not carry the force of law, *Shinholster v Annapolis Hosp*, 255 Mich App 339,

-15-

350 n 8; 660 NW2d 361 (2003), Ushe and Reliable seem to claim that the trial court should have sua sponte invalidated the standard instructions. This novel argument was not raised in the trial court.

## VI. INSTRUCTIONS ON MITIGATION, EGGSHELL PLAINTIFFS, AND AGGRAVATION OF PRE-EXISTING CONDITIONS

Ushe and Reliable first argue that the trial court erred when it refused to instruct the jury on plaintiff's failure to mitigate damages. We disagree.

M Civ JI 53.05 provides:

A person has a duty to use ordinary care to minimize his or her damages after [he or she / his or her property] has been [injured / damaged]. It is for you to decide whether plaintiff failed to use such ordinary care and, if so, whether any damage resulted from such failure. You must not compensate the plaintiff for any portion of [his / her] damages which resulted from [his / her] failure to use such care. [M Civ JI 53.05 Mitigation of Damages--Failure to Exercise Ordinary Care.]

The trial court did not abuse its discretion when it refused to give the mitigation instruction where there was no record support for such an instruction. Plaintiff's orthopedic surgeon, Dr. Vaidya, testified that plaintiff was attempting to do what was asked of him. Plaintiff attended his visits and it was not as though "he didn't show up." Vaidya explained that trauma can take three to five years to recover from, but that plaintiff did not seem to be making any progress and "it's probably not going to improve dramatically, maybe a little bit." Again, it was not for lack of trying – "He seems to try very hard." Geffrard testified that plaintiff suffered from depression, which resulted in "difficulty applying himself in therapy. He was difficult to talk to so he didn't listen real well in terms of physician instruction because he didn't feel there was hope." However, Geffrard testified that it was not as though plaintiff was non-compliant or just did not want to apply himself. The fact was that he was in significant pain. Plaintiff did not intentionally block his recovery, nor did he exaggerate his symptoms. He appeared to be "trying as best he could." The trial court did not err in declining to give the requested instruction.

Ushe and Reliable next argue that the trial court erred in giving the so-called "eggshell plaintiff" instruction found in M Civ JI 50.10, as well as the measure of damages found in M Civ JI 50.01 and the aggravation of pre-existing conditions in M Civ JI 50.04. However, the record supports the instruction.

Geffrard testified that plaintiff was not unusually susceptible to the syndesmosis injury because of his weight in the context of the mechanism of plaintiff's original injury. At trial, defendants implied that plaintiff's recovery was hampered by his excessive weight. Plaintiff's attorney responded by presenting testimony that plaintiff's size had nothing to do with it. The physicians agreed that plaintiff's problems all stemmed from, or were exacerbated by, the accident. Vaidya acknowledged that plaintiff had previous complaints of back pain but plaintiff was not disabled at the time and did not miss work. In spite of his prior complaints, plaintiff never had back surgery and appeared to be able to continue to work. Plaintiff's poor prognosis could occur in someone who was not obese. Geffrard testified that plaintiff's recovery was also

hampered by the progression of his degenerative back problems and his gait disturbance, which caused problems with other joints such as his hips. He also had issues with his shoulder. The rotator cuff injury was either caused by the accident or a result of the accident. All of these issues contributed to plaintiff's lack of mobility. Therefore, contrary to Ushe and Reliable's claims, there was record evidence to support plaintiff's theories of susceptibility to injury, aggravation of pre-existing injury, and indivisible damages. Again, other than cross-examining plaintiff's witnesses, defendants presented no medical testimony to refute the extent and nature of plaintiff's injuries.

## VII. JURY VERDICT FORM

Ushe and Reliable argue that listing plaintiff's contested injuries as conceded on the verdict form and in the jury instructions unduly and prejudicially influenced the verdict. We disagree.

The verdict form provided:

## NON-ECONOMIC LOSS

11. What is the total amount of Holt's damages for past non-economic loss for injuries to his right ankle and leg, left shoulder, lumbar disc herniation, four surgeries, traumatic brain injury, chronic pain, scars, physical pain and suffering, mental anguish, etc., from the date he was injured to the present?

*** 

12. If you find that Holt will sustain damages in the future of non-economic loss for injuries to his right ankle and leg, left shoulder, lumbar disc herniation, four surgeries, traumatic brain injury, chronic pain, scars, physical pain and suffering, mental anguish, etc., give the total amount for each year in which he will sustain damages.

Once again Ushe and Reliable never objected to any of the foregoing instructions. In fact, at trial Ushe and Reliable indicated that they had reviewed plaintiff's proposed verdict form and "[t]here's going to be some objections to some of the verbiage within there that we need to discuss and the court will need to rule on in terms of the verdict form," but there is no discussion beyond that. Citing to a Nebraska case, *Nguyen v Rezac*, 256 Neb 458; 590 NW2d 375 (1999), Ushe and Reliable argue that the verdict form was misleading and confusing because the form makes it appear as though plaintiff's injuries were conceded when, in fact, they were hotly contested. However, there is nothing objectionable about the verdict form, which was based on the model instructions in M Civ JI 50.21. Contrary to Ushe and Reliable's assertions, the verdict form did not indicate that plaintiff's injuries were conceded.

## VIII. CUMULATIVE ERROR

Finally, although Ushe and Reliable indicate that the cumulative error at trial mandates reversal, [1] their real claim is that plaintiff's counsel's behavior deprived them of a fair trial.

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error, and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action. [*Reetz v Kinsman Marine Transit Co,* 416 Mich 97, 102-103; 330 NW2d 638 (1982) (footnotes omitted).]

"An attorney's comments usually will not be cause for reversal unless they indicate a deliberate course of conduct aimed at preventing a fair and impartial trial." *Hunt v Freeman*, 217 Mich App 92, 95; 550 NW2d 817 (1996). "Reversal is required only where the prejudicial statements of an attorney reflect a studied purpose to inflame or prejudice a jury or deflect the jury's attention from the issues involved." *Id*. Stated differently, "[r]eversal is required only where the prejudicial statements reveal a deliberate attempt to inflame or otherwise prejudice the jury, or to deflect the jury's attention from the issues involved." *Zaremba Equip, Inc v Harco Nat Ins Co*, 302 Mich App 7, 21; 837 NW2d 686 (2013).

In arguing that plaintiff's counsel's behavior deprived them of a fair trial, Ushe and Reliable point to this Court's decision in *Badalamenti v William Beaumont Hosp-Troy,* 237 Mich App 278; 602 NW2d 854 (1999). In that case, we concluded that the plaintiff's attorney's behavior at trial was "truly egregious" and "far excee[ed] permissible bounds." *Id.* at 289. The attorney "completely tainted the proceedings" by repeatedly and without basis in fact accusing the witnesses of engaging in conspiracy and collusion, and fabricating evidence. *Id.* at 290. He repeatedly belittled the witnesses and suggested that they suppressed and destroyed evidence. *Id.* at 291. The attorney even accused one of the defendants of abandoning the plaintiff to engage in a sexual tryst with a nurse, while emphasizing the defendant's corporate power, and improperly appealing to the jurors' self-interest as taxpayers. *Id.* We also noted the trial court's failure to properly restrain the attorney from behaving in such a manner. *Id.* at 293.

---

[1] "In order for cumulative evidentiary error to mandate reversal, consequential errors must result in substantial prejudice that denied the aggrieved party a fair trial." *Lewis v LeGrow,* 258 Mich App 175, 200; 670 NW2d 675 (2003). "[A]ctual errors must combine to cause substantial prejudice to the aggrieved party so that failing to reverse would deny the party substantial justice." *Id.* at 201

Plaintiff's attorney's conduct in this case is far different from what occurred in *Badalamenti*. As discussed at length above, counsel questioned witnesses regarding the notice of non-party fault and the indemnification agreement as a means of attacking credibility, not in an effort to show that "Reliable and CPG had nefariously colluded against Holt" as defendants argue. While Ushe and Reliable complain that they never called plaintiff or any other witness a "liar," they did accuse plaintiff of purposefully lying about his health in the years leading up to the accident. Counsel did nothing improper by arguing that CPG's accident reconstructionist was not fully credible because she did not consider Ushe's accidents when rendering her opinion. Nor did counsel "launch a tirade" against the forensic accounting expert who used average trucking information when formulating his opinion; instead, counsel argued that, in light of evidence that plaintiff was building a fleet, plaintiff should not have been considered an average trucker. There was nothing wrong with counsel arguing that defendants' fat defense was reprehensible.

There was no effort to divert the jury's attention from the actual merits of plaintiff's case. In fact, a review of the record as a whole reveals that counsel's comments were supported by the facts elicited at trial. None of counsel's "objections, speeches, comments, and arguments qualify as inflammatory, extreme, or deliberately misleading. *Zaremba*, 302 Mich App at 22.

Finally, Ushe and Reliable seem to imply that counsel's behavior was especially egregious where Ushe had "language impediments which prevented him from understanding the questions being asked of him at trial." MCR 1.111(B)(1) provides:

> If a person requests a foreign language interpreter and the court determines such services are necessary for the person to meaningfully participate in the case or court proceeding, or on the court's own determination that foreign language interpreter services are necessary for a person to meaningfully participate in the case or court proceeding, the court shall appoint a foreign language interpreter for that person if the person is a witness testifying in a civil or criminal case or court proceeding or is a party.

However, neither Ushe nor his attorney nor counsel for CPG ever requested an interpreter and the record does not support any inability of Ushe to understand and answer the questions posed to him.

Affirmed. As the prevailing party, plaintiff may tax costs. MCR 7.219.

/s/ Michael J. Talbot
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello

-19-